UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHARON WILLIAMS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| Plaintiff, | ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR** |
| vs. | ) ) ) | **BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS** |
| DANIEL J. McCARTHY, RALPH PERLEY McBRIDE, LEROY T. BARNES, JR., PETER C.B. BYNOE, DIANA S. FERGUSON, EDWARD D. FRAIOLI, PAMELA D.A. REEVE, VIRGINIA P. RUESTERHOLZ, HOWARD L. SCHROTT, MARK S. SHAPIRO, MYRON A. WICK, III, LARRAINE D. SEGIL, JOHN M. JURELLER and MARY A. WILDEROTTER, | ) ) ) ) ) ) ) ) ) ) ) | **MISMANAGEMENT AND UNJUST ENRICHMENT** |
| Defendants, | ) ) ) | |
| – and – | ) ) | |
| FRONTIER COMMUNICATIONS CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |

**DEMAND FOR JURY TRIAL**

Plaintiff Sharon Williams brings this shareholder derivative action on behalf of nominal

defendant Frontier Communications Corporation ("Frontier" or the "Company") and against certain

current and former officers and directors of the Company for breach of fiduciary duty, abuse of

control, gross mismanagement and unjust enrichment. Plaintiff's complaint is based on personal

knowledge as to those allegations concerning herself and, as to all other matters, upon the

investigation of her counsel, including, but not limited to, review of Frontier's public statements and

press releases (including such releases and statements from Frontier's executives, members of Frontier's Board of Directors (the "Board"), and other related non-parties); Frontier's filings with the U.S. Securities and Exchange Commission (the "SEC"); Frontier's website and the statements and documents included therein; documents filed in the related securities class actions captioned *Bray v. Frontier Communications Corporation, et al*., No. 3:17-cv-01617-VAB (D. Conn.), filed September 26, 2017; *Rozenberg v. Frontier Communications Corporation, et al*., No. 3:17-cv-01672-VAB (D. Conn.), filed October 4, 2017; and *Morrow v. Frontier Communications Corporation, et al*., No. 3:17-cv-01759-VAB (D. Conn.), filed October 19, 2017; and review of other publicly available information concerning all defendants.

## NATURE OF THE ACTION

1.      Frontier is a Delaware corporation that provides communications services to urban, suburban and rural communities in 29 states.

2.      On February 5, 2015, the Company announced that it entered an agreement to acquire Verizon Communications Inc.'s ("Verizon") wireline operations in California, Texas, and Florida for $10.54 billion in cash and assumed debt.  News of the acquisition caused Frontier's stock price to jump by 8.7% to $125.55 on February 12, 2015.  The Verizon wireline acquisition was completed on April 1, 2016.  But defendants failed to disclose the fact that the wireline assets Frontier acquired from Verizon were not performing well and were causing substantial financial problems.

3.      On February 27, 2017, defendants caused the Company to begin revealing the true impact the non and underperforming wireline assets were having when they released fourth quarter of 2016 financial results.  The release stated that the Company's results were negatively impacted by the "resolution of non-paying acquired CTF accounts."  Frontier's Chief Executive Officer ("CEO"), defendant Daniel J. McCarthy, provided additional color on the effect these accounts were having when he stated that "[r]esults for the fourth quarter were impacted by our intensified efforts to

resolve acquired accounts in California, Texas and Florida that we have determined to be non-paying."

4.     During a conference call with investors that same day, defendant McCarthy explained that the Company had been working through the account-cleanup process since July 20, 2016, that the Company began disconnecting non-paying accounts at the end of August 2016, and that the disconnects continued through the first quarter of 2017.  In addition, according to defendant McCarthy, during the second quarter of 2016 the Company began to reserve aging accounts in accordance with normal policies but had to increase its reserves.  Moreover, he explained that the Company began permanent disconnects and receivable write-offs in the third quarter of 2016 that continued into the fourth quarter of 2016.

5.     These revelations caused the Company's stock price to fall nearly 11% ($5.40 per share) to a closing price of $43.95 on February 28, 2017.  This precipitous fall wiped out approximately $424 million in shareholder equity.

6.     Then, on May 2, 2017, the Company reported its first quarter 2017 financial results that included a net loss of $75 million and a year-over-year first quarter decline in revenue of $53 million.  During a conference call that day, defendant Ralph P. McBride, Frontier's Chief Financial Officer ("CFO"), stated that the non-paying accounts and the automation of legacy non-paying disconnects accounted for approximately $16 million of the revenue decline.  Defendant McBride explained that "[t]he CTF account cleanup reduced Q1 revenue by $11 million, and the onetime impact related to automating the nonpay disconnect process for the legacy properties reduced Q1 revenue by $5 million."

7.     These revelations caused the Company's stock price to plummet more than 16% to $24.15 per share on May 3, 2017, wiping out another $376.9 million in shareholder equity.  In an effort to prop up the Company's rapidly declining stock price, on or around May 12, 2017, Frontier's

Board announced a reverse stock split at a ratio of 1 share for 15 shares, which the Company announced was completed on July 10, 2017.

8.      As detailed herein, from at least February 6, 2015 through the present, defendants caused Frontier to issue false and misleading statements concerning the Company's true financial and operating condition.  For example, defendants caused the Company to make false and/or misleading statements, and/or failed to disclose that: (i) the Company acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon; (ii) as a result, the Company would be required to increase its reserves and write off amounts from accounts receivable associated with the non-paying accounts; (iii) Frontier had inadequate corporate accounting and corporate financial reporting resources; (iv) Frontier inadequately assessed the risks associated with the Company's financial reporting; (v) Frontier failed to maintain effective internal controls over financial reporting; and (vi) as a result of the foregoing, Frontier's public statements were materially false and misleading, and/or lacked a reasonable basis at all relevant times.

9.      Defendants' misfeasance and omissions have severely damaged this once valuable franchise.  Moreover, defendants' wrongful acts have caused the Company to face a complicated and expensive-to-defend securities class action.  Accordingly, defendants' violations of the law have severely damaged Frontier.

10.     Although Frontier has been severely injured, defendants have not fared nearly so badly.  During their tenure as Frontier's top insiders, defendants collectively pocketed more than $37 million in salaries, fees, stock, and other incentive-based compensation not justified in light of the serious breaches of fiduciary duty and violations of federal law that have occurred during their watch.  These payments unjustly enriched defendants.

11.     Nevertheless, the Frontier Board has not taken any legal action against the directors and officers responsible for this debacle.  Nor will it, because each of the defendants is interested in

the outcome of any such legal action.  By this action, plaintiff seeks to vindicate Frontier's interests against its wayward fiduciaries.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. §1332(a)(1).  This is because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because: (i) Frontier maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Frontier occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

15.    Plaintiff Sharon Williams has continuously held Frontier stock since at least 2014. Plaintiff is a citizen of the State of Rhode Island.

**Nominal Defendant**

16.     Nominal defendant Frontier is a Delaware corporation with its principal executive offices at 401 Merritt 7, Norwalk, Connecticut 06851.

**Defendants**

17.     Defendant Daniel J. McCarthy ("McCarthy") has served as Frontier's CEO since April 2015, and as a director of Frontier's Board since May 2014.  McCarthy knowingly, recklessly or with gross negligence: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations.  In 2015 and 2016, McCarthy received $5,118,891 and $3,312,816, respectively, in executive compensation and other compensation from Frontier not justified by the Company's performance while under his stewardship.  McCarthy is a citizen of the State of Connecticut.

18.     Defendant Ralph Perley McBride ("McBride") has served as Frontier's CFO since November 2016.  McBride knowingly, recklessly or with gross negligence: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations.   In 2016, McBride received $308,921 in executive compensation and other compensation from Frontier not justified by the Company's performance while under his stewardship.  McBride is a citizen of the State of Georgia.

19.     Defendant Leroy T. Barnes, Jr. ("Barnes") has served as a director of Frontier since May 2005.  He also served on the Audit Committee and the Retirement Committee of Frontier's Board.  Barnes knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations.  In 2015 and 2016, Barnes received $224,478 and $230,000, respectively, in directors'

fees and other compensation from Frontier not justified by the Company's performance while under his stewardship. Barnes is a citizen of the State of California.

20.     Defendant Peter C.B. Bynoe ("Bynoe") has served as a director of Frontier since October 2007. He also served on the Compensation Committee and the Nominating and Corporate Governance Committee of Frontier's Board. Bynoe knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Bynoe received $230,000 and $230,000, respectively, in directors' fees and other compensation from Frontier not justified by the Company's performance while under his stewardship. Bynoe is a citizen of the State of Colorado.

21.     Defendant Diana S. Ferguson ("Ferguson") has served as a director of Frontier since October 2014. She also served on the Audit Committee and the Compensation Committee of Frontier's Board. Ferguson knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Ferguson received $215,000 and $215,000, respectively, in directors' fees and other compensation from Frontier not justified by the Company's performance while under her stewardship. Ferguson is a citizen of the State of Illinois.

22.     Defendant Edward D. Fraioli ("Fraioli") has served as a director of Frontier since July 2010. He also served on the Audit and the Nominating and the Retirement Committee of Frontier's Board. Fraioli knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Fraioli received $240,000 and $240,000, respectively, in directors'

fees and other compensation from Frontier not justified by the Company's performance while under his stewardship. Fraioli is a citizen of the State of Massachusetts.

23.    Defendant Pamela D.A. Reeve ("Reeve") has served as a director of Frontier since July 2010. Reeve knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Reeve received $238,160 and $352,500, respectively, in directors' fees and other compensation from Frontier not justified by the Company's performance while under her stewardship. Reeve is a citizen of the State of Massachusetts.

24.    Defendant Virginia P. Ruesterholz ("Ruesterholz") has served as a director of Frontier since August 2013. She also served on the Compensation Committee and the Retirement Committee of Frontier's Board. Ruesterholz knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Ruesterholz received $227,637 and $235,000, respectively, in directors' fees and other compensation from Frontier not justified by the Company's performance while under her stewardship. Ruesterholz is a citizen of the State of Florida.

25.    Defendant Howard L. Schrott ("Schrott") has served as a director of Frontier since July 2005. He also served on the Audit Committee, the Retirement Committee, and the Nominating and Corporate Governance Committee of Frontier's Board. Schrott knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Schrott

received $224,203 and $215,000, respectively, in directors' fees and other compensation from Frontier not justified by the Company's performance while under his stewardship. Schrott is a citizen of the State of Indiana.

26.     Defendant Mark S. Shapiro ("Shapiro") has served as a director of Frontier since July 2010. He also served on the Retirement Committee of Frontier's Board. Shapiro knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Shapiro received $215,000 and $215,000, respectively, in directors' fees and other compensation from Frontier not justified by the Company's performance while under his stewardship. Shapiro is a citizen of the State of Connecticut.

27.     Defendant Myron A. Wick, III ("Wick") served as a director of Frontier from March 2005 until May 2018. He also served on the Compensation Committee and the Nominating and Corporate Governance Committee of Frontier's Board. Wick knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Wick received $220,522 and $215,000, respectively, in directors' fees and other compensation from Frontier not justified by the Company's performance while under his stewardship. Wick is a citizen of the State of California.

28.     Defendant Larraine D. Segil ("Segil") served as a director of Frontier from May 2005 until May 2017. She also served on the Compensation Committee and the Retirement Plan Committee of Frontier's Board. Segil knowingly or recklessly: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to

maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Segil received $215,000 and $215,000, respectively, in directors' fees and other compensation from Frontier not justified by the Company's performance while under her stewardship. Segil is a citizen of the State of California.

29.     Defendant John M. Jureller ("Jureller") served as Frontier's CFO from January 2013 to November 2014. Jureller knowingly, recklessly or with gross negligence: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. In 2015 and 2016, Jureller received $2,716,987 and $1,799,141, respectively, in executive compensation and other compensation from Frontier not justified by the Company's performance while under his stewardship. Jureller is a citizen of the State of New York.

30.     Defendant Mary A. Wilderotter ("Wilderotter") served as Frontier's CEO from November 2004 to April 2015. Wilderotter also served as a director of Frontier from September 2004 to March 31, 2016, including as Chairman of the Board from December 2005 to April 3, 2015, and as Executive Chairman of the Board from April 1, 2015 to March 31, 2016. According to the Company's 2016 Proxy, Wilderotter's "key accomplishments" in fiscal 2015 included "the negotiation of and entry into the agreement with Verizon Communications Inc. to acquire the California, Texas and Florida wireline properties and the achievement of key milestones to close that transaction." Wilderotter retired and stepped down from the Board on March 31, 2016. Wilderotter knowingly, recklessly or with gross negligence: (i) caused or allowed Frontier to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Frontier's accounting practices and operations. Wilderotter received a sum of $12,101,520 in total compensation from Frontier from

2015 until, and in connection with, her resignation in 2016.  Wilderotter, in connection with her resignation, was entitled to certain benefits pursuant to her employment agreement, valued at approximately $6,431,296, which included: (i) the vesting of her outstanding restricted stock awards as though her service continued for an additional 12 months beyond her resignation date, valued at approximately $4,992,533; (ii) the vesting of her restricted stock units in accordance with their terms, and the vesting of her performance shares upon her resignation based on actual performance, valued at approximately $1,124,337; and (iii) certain other benefits, including, *inter alia*, the receipt of accrued but unpaid vacation time, and the cost for continued medical, dental and other health benefits, and extended life insurance for 36 months after her resignation, valued at approximately $314,427.  Wilderotter is a citizen of the State of Nevada.

31.    Defendants, and each of them, received Frontier's earning reports before or shortly after their issuance.  Nevertheless, defendants each failed to prevent their issuance or correct their false and misleading content, thereby breaching their fiduciary duties owed to Frontier and its shareholders.  Moreover, defendants, and each of them, because of their positions and access to material non-public information, knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were therefore materially false and misleading.

## THE FIDUCIARY DUTIES OF FRONTIER'S
## OFFICERS AND DIRECTORS

32.    Each officer and director of Frontier owed the Company and its shareholders the duty to exercise a high degree of care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Frontier's directors and officers complained of herein involves fraudulent misconduct – a knowing, intentional, and culpable violation of their obligations as directors and/or officers of Frontier, and the absence of good faith on their part concerning their duties to the Company and its

shareholders. The misconduct of Frontier's officers has been ratified by Frontier's Board, which has failed to take any legal action on behalf of the Company against them.

33.     By reason of their positions as officers, directors and/or fiduciaries of Frontier and because of their ability to control the business and corporate affairs of Frontier, defendants owed Frontier and its shareholders fiduciary obligations of candor, trust, loyalty, and care and were required to use their ability to control and manage the Company in a fair, just, honest, and equitable manner and to act in furtherance of the best interests of Frontier and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. In addition, as officers and/or directors of a publicly held company, defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, projections and forecasts, so as to: (i) fulfill their duty of candor and honesty to Frontier's existing shareholders; and (ii) so that the market price of Frontier stock would be based on truthful and accurate information.

34.     Defendants, because of their positions of control and authority as directors and/or officers of Frontier, were able to and did, directly and indirectly, control the wrongful acts complained of herein. Because of their executive and directorial positions with Frontier, each defendant had access to adverse non-public information about the financial condition, operations, and future business prospects of Frontier and was required to disclose it promptly and accurately to Frontier's shareholders and the financial markets but did not do so.

35.     The Charter of the Audit Committee of the Frontier Board confirms the obligation of each defendant serving on the Company's Audit Committee to honestly and truthfully prepare and present the Company's financial results and statements. Specifically:

> The Committee shall assist the Board in undertaking and fulfilling its responsibilities in overseeing (i) the integrity of the financial statements of the Company, (ii) the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, (iii) the Company's compliance with legal and regulatory requirements, (iv) the independence, qualifications and performance of the Company's independent auditors, and (v) the qualifications and performance of the

Company's internal audit function.  The Committee shall report regularly to the Board.

By virtue of such duties and by the terms of the Audit Committee Charter, the Audit Committee members of Frontier's Board were required, among other things, to:

**Powers and Responsibilities**

The powers and responsibilities of the Committee are set forth below as a guide to fulfilling the Committee's purposes, with the understanding that the Committee's activities may diverge as appropriate given the circumstances.  The Committee is authorized to carry out these activities and other actions reasonably related to the Committee purposes or assigned by the Board from time to time.  These are in addition to powers and responsibilities that the members of the Committee may have as directors of the Company or as members of other committees of the Board.  The Company's management is responsible for preparing the Company's financial statements and the independent auditors are responsible for auditing those statements.  The Committee recognizes that Company management, including the internal audit staff, and the independent auditors have more time, knowledge and detailed information about the Company than do Committee members.  Consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditor's work.

The Committee may form, and delegate any of its responsibilities to, a subcommittee so long as such subcommittee is solely comprised of one or more members of the Committee.

**The Committee shall**

1.      Appoint, subject to non-binding stockholder ratification (and, if appropriate dismiss), evaluate, compensate and oversee (taking into account the opinions of management and the Company's internal auditor, where appropriate) the work of the independent auditor, who shall report directly to the Committee.

2.      Meet with the independent auditors prior to the audit to review the scope, planning and staffing of the audit and approve in advance any audit and permitted non-audit services (including the estimated fees and terms thereof) to be provided by the independent auditor, and such other matters pertaining to such audit as the Committee may deem appropriate (with pre-approvals disclosed as required in the Company's periodic public filings).

3.      Review a report by the independent auditors at least annually, describing: (i) the independent auditor's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditors or the review of the independent auditors by the Public Company Accounting Oversight Board, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting

one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues; and (iii) all relationships between the independent auditors and the Company which may relate to the auditors' independence.

*    *    *

6.      Review with management, the internal auditors and the independent auditors: (i) any significant findings during the year, including the status of previous audit recommendations; (ii) problems or difficulties encountered in the course of the audit work, including restrictions on the scope of activities or access to required information and disagreements with management; (iii) any changes required in the scope of the audit plan; (iv) the audit budget and staffing; (v) the coordination of audit efforts in order to monitor completeness of coverage, reduction of redundant efforts, and the effectiveness of audit resources; (vi) accounting adjustments that were noted or proposed by the independent auditors and that were "posted" or "passed" (as immaterial or otherwise); and (vii) any management letter proposed to be issued, by the independent auditors.

7.      Oversee the resolution of disagreements between management and the independent auditors regarding financial reporting.

8.      Meet to review and discuss with management, the independent auditors and the internal auditors the quality and adequacy of the Company's financial reporting processes, internal controls and disclosure controls and procedures, including whether there are any significant deficiencies in the design or operation of such processes, controls and procedures, material weaknesses in such processes, controls and procedures, any corrective actions taken with regard to such deficiencies and weaknesses and any fraud involving management or other employees with a significant role in such processes, controls and procedures.

9.      Review the Company's financial statements, including: (i) prior to public release, reviewing with management and the independent auditor the Company's annual and quarterly financial statements to be filed with the SEC, including (a) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (b) any certifications regarding the financial statements or the Company's internal accounting and financial controls and procedures and disclosure controls and procedures filed with the SEC by the Company's senior executive and financial officers and (c) the matters required to be discussed with the independent auditor by the applicable Statement of Auditing Standards (or successor provisions); (ii) with respect to the independent auditor's annual report and certification, before release of the annual audited financial statements, meeting separately with the independent auditor without any management member present and discussing the adequacy of the Company's system of internal accounting and financial controls and the appropriateness of the accounting principles used in and the judgments made in the preparation of the Company's audited financial statements and the quality of the Company's financial reports; (iii) meeting separately, periodically, with management, with internal auditors (or other personnel responsible for the internal audit function) and with the

- 14 -

independent auditor; and (iv) making a recommendation to the Board regarding the inclusion of the audited annual financial statements in the Company's Annual Report on Form 10-K to be filed with the SEC.

10.    Review with management and the independent auditor any material financial or non-financial arrangements that do not appear on the Company's financial statements that are brought to the attention of the Committee.

11.    Prepare a report to be included in the Company's annual proxy statement stating whether or not the Committee: (i) has reviewed the audited financial statements with management; (ii) has discussed with the independent auditor the matters required to be discussed by the applicable Statement of Auditing Standards (or successor provisions); (iii) has received the written disclosure and letter from the independent auditor (delineating all relationships it has with the Company) and has discussed with the independent auditor its independence; and (iv) based on the review and discussions referred to above, the members of the Committee recommended to the Board that the audited financials be included in the Company's Annual Report on Form 10-K for filing with the SEC.

12.    Review analyses prepared by management or the independent auditor of significant accounting and financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including: (i) analyses of all critical accounting policies and practices used; (ii) off-balance sheet financial structures; (iii) the effects of GAAP methods on the Company's financial statements, and of non-GAAP financial information, including the use of "pro forma" or "adjusted" financial data included in financial reporting; and (iv) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

13.    Review matters that have come to the attention of the Committee through reports to the Committee from management, legal counsel, and others, that relate to the status of compliance or disclosure with laws, regulations, internal policies and controls, and that may be expected to be material to the Company's financial statements.

14.    Review with management and the independent auditor the potential effect of regulatory and accounting initiatives on the Company's financial statements.

15.    Review with management and the independent auditor any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies.

16.    Review with management the Company's earnings press releases, as well as financial information and any guidance provided to analysts and ratings agencies, including the use of "pro forma" or "adjusted" financial data. Such review may be done generally (consisting of reviewing the types of information to be

disclosed and the types of presentations to be made) and need not be in advance of each earnings release or each instance in which the Company provides any guidance.

17.    Discuss with the Company's General Counsel legal matters that may have a material impact on the Company's financial statements or compliance policies.

18.    Review and discuss with management, the senior internal auditor, and the independent auditor: (i) the guidelines for the internal controls over financial reporting; (ii) reportable conditions that are identified in the implementation of the internal controls; (iii) the occurrence of fraud (whether material or not) that involves management or other employees of the Company who have a significant role in internal control over financial reporting; (iv) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data; and (v) any significant audit steps adopted in light of such control deficiencies.

*      *      *

20.    Review and discuss with management, the internal auditor and the independent auditor (i) the guidelines and policies to govern the process by which the Chief Executive Officer and senior management assess and manage the Company's exposure to risk, including the Company's Enterprise Risk Management process and (ii) the Company's major financial, operational and reputational risk exposures and the steps management has taken to monitor and control such exposures and advise the Board with respect to such exposures.

21.    Review reports from management, the Company's senior internal auditor, and the independent auditor regarding the Company's compliance with applicable legal requirements and the Company's Code of Ethics. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Ethics.

22.    Approve procedures for the treatment of complaints received by the Company regarding accounting, internal controls over financial reporting or auditing matters. Establish procedures for (i) the receipt, retention and treatment of complaints from employees on accounting, internal accounting controls or auditing matters and (ii) the confidential, anonymous submissions by Company employees of comments regarding questionable accounting or auditing matters.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.    In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design. In addition to the wrongful conduct complained of herein giving rise to

primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duties.

37.    Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

38.    Frontier provides communications services in the United States, including broadband, video and voice services.  The Company currently services 5.4 million customers, 4.3 million broadband subscribers and operates in 29 states.

39.    As part of Frontier's aggressive growth strategy, Frontier acquires other businesses and companies. On April 1, 2016, Frontier acquired Verizon's wireline operations in California, Texas and Florida (the "Verizon Acquisition"), for a purchase price of $10.5 billion in cash and assumed debt.  By way of this acquisition, Frontier sought to become a market leader in the communications industry.  Based on this, defendants falsely misrepresented the success of the acquisition by publicizing the acquisition as a boon to the Company, stating that the acquisition of Verizon's operations "expands our footprint in large and growing markets," and further claiming the Company's revenue and earnings per share ("EPS") were expected to rise significantly as a result of the acquisition.  But defendants never revealed that the Verizon operations Frontier acquired were not performing well and were causing substantial financial problems.

**Frontier's False and Misleading Statements**

40.    Between February 2015 and at least February 2018, Frontier, while under the stewardship of defendants, engaged in an unlawful scheme designed to artificially inflate the trading price of Frontier's common stock and, in turn, the Company's market capitalization.  To achieve

defendants' goal, defendants caused Frontier to systematically issue a series of positive – albeit false and misleading – representations about the strength of Frontier's business and the resulting strong financial health and revenue growth that the Company purportedly would enjoy as a result of the Verizon Acquisition. For example, on February 5, 2015, after the market closed, defendants caused Frontier to issue a press release announcing a definitive agreement to acquire the wireless operations of Verizon in California, Texas and Florida. The February 5, 2015 press release stated, in relevant part, as follows:

**Frontier Communications to Acquire Verizon's Wireline Operations in California, Florida and Texas, Doubling Frontier's Size and Driving Shareholder Value**

\*       \*       \*

Frontier Communications Corporation is today announcing a definitive agreement with Verizon Communications Inc. under which Frontier will acquire Verizon's wireline operations that provide services to residential, commercial and wholesale customers in California, Florida and Texas, for $10.54 billion in cash. These Verizon properties include 3.7 million voice connections, 2.2 million broadband connections, and 1.2 million FiOS® video connections. The network being acquired is the product of substantial capital investments by Verizon and is 54 percent FiOS enabled. Subject to regulatory approval, the transaction is expected to close in the first half of 2016.

"This transaction marks a natural evolution for our company and leverages our proven skills and established track record from previous integrations," said Maggie Wilderotter, Frontier Communications Chairman and Chief Executive Officer. "*These properties are a great fit for Frontier and will strengthen our presence in competitive suburban markets and accelerate our recent market share gains. We look forward to realizing the benefits this transaction will bring to our shareholders, customers and employees*."

Lowell C. McAdam, Chairman and Chief Executive Officer of Verizon, said, "*This transaction will further strengthen Verizon's focus on extending our leadership position in our core markets and create value for both Verizon and Frontier shareholders*. Frontier has proven to be an excellent partner. Together we will ensure a smooth transition for our customers and employees, and I have no doubt these teams will continue putting the customer first."

Dan McCarthy, Frontier's President and Chief Operating Officer, commented, "This transaction is an exciting opportunity for Frontier. *We are well positioned to maximize value for our shareholders and create a great experience for new customers. We have four FiOS markets today from our 2010 transaction*

*with Verizon, and a high level of familiarity with the systems underlying these properties. We plan to flash-cut convert these properties to Frontier's systems as we did in states including West Virginia and Connecticut*."

The transaction provides substantial benefits, including:

- **Strong Revenues, Accretion to Free Cash Flow and Dividend Sustainability**: The Verizon wireline operations being acquired by Frontier generated revenue of more than $5.7 billion in 2014. As a result of certain Verizon-allocated overhead costs not transferring to Frontier, or being replaced by Frontier's lower cost structure, Frontier expects costs to be reduced by $525 million in the first year after close and $700 million by year three. Frontier expects the transaction to be 35 percent accretive to free cash flow per share in year one and to improve Frontier's strong dividend payout ratio by 13 percentage points.

41.    On a conference call that same day, defendant Wilderotter reiterated the Company's purported strong future performance, describing the potential as a result of the Verizon Acquisition as "expanding our footprint in large and growing markets." Defendant Wilderotter further stated:

First and foremost, Frontier is gaining high-quality assets with strong revenue and cash flow. Verizon has invested over $7 billion in the build out in these three states, which now enjoy a high availability of FiOS services; [totally 54%] of the acquired network is FiOS enabled. On the strength of their upgraded and well maintained networks, these properties generated revenue of more than $5.7 billion in 2014. With certain Verizon allocated overhead costs, that will not be transferring to Frontier or will be replaced by Frontier's lower cost structure, we expect operations to add $2.3 billion per annum in day one EBITDA.

. . . This transaction will contribute significantly to shareholder value, and we estimate that it will be 35% accretive to free cash flow per share in the first year after closing. We anticipate achieving $525 million in year one cost savings due to the elimination of allocated costs and leveraging Frontier's lower cost structure. Annual savings grow to $700 million per year in year three. Because of the size of this transaction and our integration experience, there is even more potential to achieve even greater economies of scale. We have a proven track record of achieving and exceeding acquisition cost savings, and we are confident in our ability to realize them in this transaction as well.

42.    Similarly, on February 19, 2015, defendants caused Frontier to announce its financial and operating results for the fourth quarter of 2014. The Company "reported fourth quarter 2014 revenue of $1,330 million, operating income of $173 million and net income attributable to common shareholders of $14 million, or $0.01 per share." The press release further stated:

The increase in total revenue during the fourth quarter of 2014 is primarily due to the additional revenue of $216 million as a result of the Connecticut operations acquired on October 24, 2014 (the Connecticut Acquisition) and an increase in data services revenue, partially offset by declines in other revenue for the Frontier legacy operations.

43.    During a conference call held on the same day for analysts to discuss the fourth quarter results, defendants Wilderotter and McCarthy reiterated the strong value and purported benefits as a result of the Verizon Acquisition, stating, "we look forward to the very substantial benefits of our acquisition plans in California, Florida and Texas" and "we are confident that this transaction will be very rewarding for our shareholders too," respectively.

44.    During the same call, defendant Jureller also misrepresented the strength of the Verizon Acquisition and the potential value, emphasizing that "[t]his is a transformative opportunity, one that meaningfully enhances our long-term competitive position.    Further, it significantly enhances shareholder value."    Defendant Jureller, in discussing the growth potential, further explained:

> On a pro forma basis, we estimate that in the first full-year, this will add approximately $5.4 billion of revenue and $2.3 billion of adjusted day-one EBITDA. Total new Frontier revenue and EBITDA will be approximately $11.7 billion and $4.9 billion, respectively.  We estimate that this transaction will be 35% accretive to our leveraged free cash flow per share, and lower our dividend payout ratio by 13 percentage points in the first full-year.

> We are comfortable with a pro forma leverage, with our financing plans allowing us to maintain our corporate and unsecured debt ratings.  We currently estimate being in the public markets in the second half of 2015 with our capital raising plans that include approximately $3 billion of equity and $8 billion of debt. We will be opportunistic in completing our financing prior to the estimated first-half 2016 completion of this transaction.

45.    On February 25, 2015, defendants caused Frontier to file with the SEC an Annual Report on Form 10-K (the "2014 10-K").  The 2014 10-K was reviewed and approved by the Board, and signed by defendants Barnes, Bynoe, Ferguson, Fraioli, Jureller, McCarthy, Reeve, Ruesterholz, Schrott, Segil, Shapiro, Wick and Wilderotter.  The 2014 Form 10-K reiterated the Company's

previously announced details regarding the Verizon Acquisition reported on February 5, 2015 and

February 19, 2015, and stated in relevant part as follows:

**The Verizon Transaction**

On February 5, 2015, the Company entered into an agreement with Verizon Communications Inc. (Verizon) to acquire Verizon's wireline operations that provide services to residential, commercial and wholesale customers in California, Florida and Texas for a purchase price of $10.54 billion in cash (the Verizon Transaction). As of the date of the announcement, these Verizon properties included 3.7 million voice connections, 2.2 million broadband connections, and 1.2 million FiOS® video connections. The network being acquired is the product of substantial capital investments made by Verizon and is 54% FiOS® enabled. Subject to regulatory approval, the transaction is expected to close in the first half of 2016.

*       *       *

***Evaluate Strategic Initiatives***. We selectively evaluate and may pursue strategic acquisitions that would enhance shareholder value. On October 24, 2014, the Company acquired the wireline properties of AT&T in Connecticut. On February 5, 2015, the Company entered into an agreement with Verizon to acquire Verizon's wireline operations in California, Florida and Texas. We consider transactions that we believe present opportunities consistent with our overall business strategy, that complement or expand our product offerings or extend our geographic scope or customer base. We will continue to adhere to our selective criteria in any acquisition analysis.

46.     On April 20, 2015, defendants caused Frontier to file with the SEC a registration

statement and prospectus on Form S-3ASR (the "2015 Registration Statement"), pursuant to which

the Company would issue common stock and preferred stock for sale. The 2015 Registration

Statement incorporated by reference the 2014 10-K. The 2015 Registration Statement was signed by

defendants Barnes, Bynoe, Ferguson, Fraioli, Jureller, McCarthy, Reeve, Ruesterholz, Schrott, Segil,

Shapiro, Wick and Wilderotter.

47.     On May 5, 2015, defendants hosted a conference call for analysts to discuss the

financial results for the first quarter of 2015. During the call, defendant McCarthy reiterated the

value and successes as a result of the pending Verizon Acquisition, stating: "We remain very excited

about the benefits of the Verizon transaction for our customers and our shareholders. As we have

previously stated, this transaction continues a fundamental transformation of Frontier that really commenced with our 2010 Verizon transaction."

48.     On May 7, 2015, Frontier filed with the SEC a Form 10-Q for the first quarter of 2015 (the "Q1 2015 10-Q"), which confirmed the financial results discussed during the conference call held on May 5, 2015.  The Q1 2015 10-Q was reviewed and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants McCarthy and Jureller.

49.     On June 8, 2015, defendants caused Frontier to file two prospectus supplements on Form 424B2 (the "2015 Prospectus Supplements"), which stated that the Company would be offering 17,500,000 shares of 11.125% mandatory, convertible, preferred stock (or 19,250,000 shares if the underwriters exercise their overallotment option to purchase additional shares in full), at a price of $100.00 per share, for proceeds of $1.75 billion, and would be concurrently offering 150,000,000 shares of common stock (plus up to an additional 15,000,000 shares that the underwriters had the option to purchase), at a price of $5.00 per share, for proceeds of $750 million. The 2015 Prospectus Supplements reaffirmed the previously announced details regarding the Verizon Acquisition, and explicitly stated that, "[p]ursuant to the terms of the Verizon Purchase Agreement, [Frontier] intend[s] to place a portion of the proceeds of this offering and the concurrent offering into escrow for use solely in paying amounts payable pursuant to the Verizon Purchase Agreement."  The 2015 Prospectus Supplements also incorporated by reference the 2014 10-K and the Q1 2015 10-Q.

50.     On June 10, 2015, defendants caused Frontier to announce that the Company had closed the secondary offerings previously described in the 2015 Prospectus Supplements.  The June 10, 2015 press release also stated: "Frontier intends to use the proceeds from the offerings to finance a portion of the cash consideration payable in connection with Frontier's previously announced

acquisition of the wireline operations of Verizon Communications Inc. in California, Florida and Texas and to pay related fees and expenses."

51.    On August 3, 2015, defendants caused Frontier to announce its financial and operating results for the second quarter of 2015.  The Company reported "second quarter 2015 revenue of $1,368 million, operating income of $193 million and net loss of $28 million, or $0.03 per share."  Further, the press release stated:

> "We continue to make progress on our approval, integration and financing of the Verizon Transaction.  During the quarter we successfully completed a $2.75 billion equity raise as the underpinning for the remaining financing.  We are also on track to obtain all required regulatory approvals as well as complete the integration of the Verizon properties."

52.    During a conference call held on the same day for analysts to discuss the second quarter results, defendant McCarthy reiterated the potential value and growth Frontier will see as a result of the Verizon Acquisition, stating:

> ***The Verizon acquisition will transform Frontier***.  As you can see from the pie chart on this slide, with the addition of the Verizon markets residential voice revenues will constitute less than 20% of Frontier's pro forma revenue based on 2014 run rates.
>
> Likewise, wireless backhaul revenues from the continuing Frontier territories will comprise only about 2% of overall revenues, making any future declines less consequential.
>
> We will also gain a substantially and large FiOS footprint and much greater scale.  ***This transaction increases Frontier's growth profile and reduces our exposure to declining portions of our business, improving our business mix significantly***.  Another benefit of this transaction is the technology refresh that we will enjoy for our existing FiOS markets.  We are currently finalizing our plans to introduce this new technology in these FiOS markets in Q4.
>
> The new FiOS platform and existing Verizon pricing and bundles will become the new standard for our current FiOS markets later this year.  This will allow us to have three to six months of operation of the refreshed platform prior to integration of the new states.
>
> We will utilize this time to get our team very comfortable with the new features, functionality and business processes needed to support the current FiOS platform.  And then we will continue the exact Verizon pricing and bundle construction in the new markets following conversion.  As a result, we will not see the migration impact we saw in Connecticut in Q1.

This conversion change will reduce training requirements of transferring employees, maintain the effectiveness of alternate channel partners, and most importantly, ***prevent the possibility of revenue declines associated with bundle migration as we experienced in Connecticut***.

*****We continue to anticipate significant synergies as we substitute Frontier's lower cost structure for Verizon's***.  The Frontier team is working to deliver at or above synergies and EBITDA levels that we have communicated.  The key driver of our synergies is the elimination of the Verizon expense allocations.

As we approach the midpoint of our integration efforts we remain highly confident in delivering on pro forma financial projections.  We continue to estimate that the completion of the Verizon transaction will provide over 30% accretion to leverage free cash flow per share in the first full year and will result in a solid improvement to our dividend payout ratio.

53.    On August 5, 2015, defendants caused Frontier to file with the SEC a Form 10-Q for the second quarter of 2015 (the "Q2 2015 10-Q"), which confirmed the financial results discussed during the conference call held on August 3, 2015.  The Q2 2015 10-Q was reviewed and contained signed SOX certifications by defendants McCarthy and Jureller.

54.    On October 5, 2015, the Company filed its Opening Brief before the Public Utilities Commission of the State of California.  In this filing, defendants stated that Frontier had a "proven ability to successfully transition customers to its network, as demonstrated by the 2010 acquisition of certain Verizon operations," and it specified that no customers would face service disruptions – including to 911 service – as a result of the Verizon Acquisition.

55.    On November 3, 2015, defendants caused Frontier to announce its financial and operating results for the third quarter of 2015.  The Company reported "third quarter 2015 revenue of $1,424 million, operating income of $207 million and net loss of $14 million, or $0.01 per share." The press release further stated:

"Frontier continues to make good progress toward completing our integration efforts for the Verizon acquisition" Mr. McCarthy said.  "We are in the process of expanding our infrastructure and adding resources in order to have capabilities and capacity in place in advance of the anticipated March 31, 2016 closing.  We remain confident in our ability to achieve the substantial synergies we have targeted post-closing and have begun planning on additional cost efficiency opportunities that will be a result of our significantly larger scale.  Our fourth quarter focus is all about

operational execution to improve our customer revenue, lower our costs and prepare for the successful integration of the Verizon businesses."

56.     During a conference call held on the same day for analysts to discuss the third quarter

results, defendant McCarthy reiterated potential value and growth Frontier will see as a result of the

Verizon Acquisition, stating:

> Most importantly, *I want to assure you that I am fully confident that we will achieve, and even exceed the synergy targets we have outlined for Frontier post close of the Verizon transaction*.  Furthermore, we also will have identified opportunities to improve efficiencies in our existing business post closing, through the application of new technologies that we are developing as part of the Verizon integration.  We anticipate that this will result in an incremental improvement to our expenses.
>
> *        *        *
>
> Please turn to slide four.  Let me turn to a quick update on our Verizon transaction.  As you know, the Verizon acquisition will transform Frontier significantly, materially transitioning Frontier's revenue to a more diversified mix with better growth prospects.  Our integration teams continue to work diligently, and we remain confident that we will be ready for closing on March 31, 2016.  Financing is completely in place, regulatory approvals are nearly complete with one pending, union agreements have been reached, and integration is on track.
>
> I would like to provide more details on the integration process and our current status.  First, we now have completed all integration project plans that detail all our responsibilities, and critical paths in transitioning the network traffic from Verizon's network onto ours.  Also covered is the system conversion, as well as customer data migration.  This is a highly complex process, and attention to detail is critical.  Our goal is flawless execution.  In this regard, I am very pleased to report that we have had the successful completion of our first mock data conversion.  This process is off to a great start.  We will have several more, before we are ready to close, and our internal results are ahead of our expectations.  In terms of IT, we are continuing to put in place the necessary features and capabilities to handle the new market.  This touches all elements of the business, handling dramatically expanded customer data, processing twice the number of monthly bills, and supporting double the number of employees.

57.     Similarly, on November 5, 2015, defendants caused Frontier to file with the SEC a

Form 10-Q for the third quarter of 2015 (the "Q3 2015 10-Q"), which announced the financial

results and further discussed the growth and value as a result of the Verizon Acquisition.  The Q3

2015 10-Q was reviewed and contained signed SOX certifications by defendants McCarthy and Jureller.

58.    The above statements and omissions set forth in ¶¶40-57 were false and misleading and/or failed to disclose that: (i) the Company acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon; (ii) as a result, the Company would be required to increase its reserves and write off amounts from accounts receivable associated with the non-paying accounts; (iii) defendants were aware that the Company was acquiring a substantial number of non-paying accounts; (iv) as a result of the increase in reserves and write-offs, the Company could not provide the growth and revenue as proclaimed in Frontier's public filings; and (v) the non-paying accounts would negatively impact Frontier's revenue and growth.

59.    On September 9, 2015 and September 11, 2015, respectively, defendants caused Frontier to issue press releases (the "September 2015 Press Releases") announcing a private offering of $6.6 billion aggregate principal amount of unsecured senior notes, as follows: $1 billion of 8.875% Senior Notes due 2020; $2 billion of 10.500% Senior Notes due 2022; and $3.6 billion of 11.000% Senior Notes due 2025.  The September 2015 Press Releases also stated:

> Frontier intends to use the proceeds from the offering to finance a portion of the cash consideration payable in connection with its previously announced acquisition of the wireline properties of Verizon Communications Inc. in California, Florida and Texas and to pay related fees and expenses.  The acquisition is expected to close by the end of the first quarter of 2016.  The net proceeds of the offering will be deposited in an escrow account to partially fund the acquisition or, if the acquisition is terminated or otherwise not consummated on or before August 6, 2016, to redeem the Notes at par plus accrued interest.

60.    On this news, the Company's stock price fell $3.45 (more than 4%), on unusually heavy trading volume, to close at $78.30 per share on September 14, 2015, erasing nearly $342 million in market capitalization.

61.    On February 23, 2016, Frontier held an earnings call, during which defendant McCarthy stated:

The integration teams from both sides have been extremely diligent in planning a detailed cutover with the mutual objective of minimal customer disruption.

*       *       *

The system conversions are on track, and we are seeing conversion metrics at or above our expectations for this point in the conversion process.

All indications are very positive . . . .

*       *       *

[A]s we execute on the Verizon I think you'll see a very smooth transition and no impact like we saw in Connecticut.

62.     On February 24, 2016, defendant Jureller appeared at the Jefferies Media & Communications Conference and stated:

Obviously, we want to make sure that people have that same experience when they turn on their set-top box, their TV . . . in that first hour.  So 12:01 a.m. on April 1, they're having that same experience.  They also see their same video-on-demand library, the things that they've already saved and queued up.  So we have learned a lot from the successive flash cuts that we've done.

. . . [S]ome of the lessons that we've learned is we want to make sure that we've not missed anything in the process.

63.     On February 25, 2016, defendants caused Frontier to file with the SEC an Annual Report on Form 10-K for the fourth quarter of 2015 and fiscal year 2015 (the "2015 10-K").  The 2015 10-K reaffirmed the previously announced details regarding the Verizon Acquisition and the secondary offering, and was signed by defendants Barnes, Bynoe, Ferguson, Fraioli, Jureller, McCarthy, Reeve, Ruesterholz, Schrott, Segil, Shapiro, Wick and Wilderotter.

64.     On February 29, 2016, John Gianukakis, Frontier's Vice President and Treasurer, appeared at the Morgan Stanley Technology, Media & Telecom Conference and stated:

Obviously, before the transaction consummates, we did a lot of work and diligence as you can imagine.  But over the next year, we worked really very, very closely with the teams over at Verizon to get into the details of the operations, going through every aspect of running and managing this business and mapped over all the parts of the business.

*       *       *

We've got adequate workforce, we've got our call centers fully staffed. That's one of the learnings we have on prior transactions to make sure we've got enough people answering the phone.

\*     \*     \*

So, we've really overstaffed the call centers, we're doing it at the time of the year that is seasonally a bit quieter and we've done a lot of practice, right. We've gone through these and really scrubbed through every business part of what we need to do and feel very confident that we would execute on this.

65.     On April 1, 2016, defendants caused Frontier to announce the completion of the Verizon Acquisition. The press release stated, in relevant part, as follows:

**Frontier Communications Completes Acquisition of Verizon Wireline Operations in California, Texas and Florida**

Frontier Communications Corporation today announced completion of its $10.54 billion acquisition of Verizon Communications, Inc. wireline operations providing services to residential, commercial and wholesale customers in California, Texas and Florida. The acquired businesses include approximately 3.3 million voice connections, 2.1 million broadband connections, and 1.2 million FiOS® video subscribers, as well as the related incumbent local exchange carrier businesses. New customers will begin receiving monthly bills starting in mid-April.

*"**This is a transformative acquisition for Frontier that delivers first-rate assets and important new opportunities given our dramatically expanded scale,"** said Daniel J. McCarthy, Frontier's President and Chief Executive Officer. **"It significantly expands our presence in three high-growth, highdensity states, and improves our revenue mix by increasing the percentage of our revenues coming from segments with the most promising growth potential**.*"

Frontier is pleased to welcome from Verizon approximately 9,400 employees. "Our new colleagues know their markets, their customers and their business extremely well," McCarthy said. "As valued members of the Frontier team, they will ensure continuity of existing customer relationships."

66.     On April 22, 2016, defendants caused Frontier to file with the SEC a registration statement and prospectus on Form S-4 (the "2016 Registration Statement"), pursuant to which the Company would issue senior notes as previously identified in the September 2015 Press Releases. The 2016 Registration Statement noted that proceeds from sale of the senior notes "will be used to consummate, or in connection with the financing of, the Verizon Acquisition and any related financing." The 2016 Registration Statement incorporated by reference the 2015 10-K. The 2016

Registration Statement was signed by defendants Barnes, Bynoe, Ferguson, Fraioli, Jureller, McCarthy, Reeve, Ruesterholz, Schrott, Segil, Shapiro and Wick.

67.    On May 3, 2016, defendants caused Frontier to announce its financial and operating results for the first quarter of 2016. For the quarter, the Company reported adjusted net income of $14 million, or $0.1 per diluted share, on revenue of $1,355 million, compared to adjusted net income of $21 million, or $0.02 per diluted share, on revenue of $1,371 million for the same period in the prior year. The May 3, 2016 press release stated, in relevant part, as follows:

> Frontier Communications Corporation today reported that it achieved solid first quarter results while preparing for the industry's largest and most complex flashcut conversion in its new California, Texas and Florida markets. The flashcut conversion was executed on April 1, and the Company will begin to realize financial results from its newly combined business in the coming quarters.
>
> "We see enormous opportunity in these new markets with millions of new customers," said Dan McCarthy, Frontier President and Chief Executive Officer. "In addition to increased scale, these areas are each very attractive with significant growth potential. After a month of operating these properties, we are very pleased with the progress we have made and we want to thank customers for their patience during the transition period. The entire Frontier team remains focused on cultivating growth by retaining and attracting new customers. We will continue to drive Frontier's performance to maintain free cash flow that provides an attractive and sustainable dividend payout ratio."
>
> Frontier reported first quarter 2016 revenue of $1,355 million, operating income of $58 million and net loss of $186 million, or $0.16 per share. Excluding acquisition related interest expense of $188 million and acquisition and integration costs of $138 million (combined after-tax impact of $200 million, or $0.17 per share), non-GAAP adjusted net income was $14 million, or $0.01 per share, for the first quarter of 2016 (See attached Schedule B).
>
> **Total revenue** for the first quarter of 2016 was $1,355 million. This represents a sequential decline of $58 million, or 4%, from the $1,413 million reported in the fourth quarter of 2015, primarily resulting from a one-time sequential decline of $40 million in the recognition of regulatory revenue that was in line with previously disclosed expectations and a decline in voice services revenue. Frontier recognized Connect America Fund Phase II (CAF II) revenue for the first time in the second half of 2015, resulting in the majority of the full year CAF II revenue being recognized in the third and fourth quarters of 2015.

*       *       *

**Acquisition and integration costs** for the first quarter of 2016 were $138 million related to the Verizon transaction compared to $86 million in the fourth quarter of 2015.

**Operating income** for the first quarter of 2016 was $58 million and operating income margin was 4.3% compared to operating income of $182 million and operating income margin of 12.9% in the fourth quarter of 2015.

**Interest expense** for the first quarter of 2016 was $373 million compared to $362 million in the fourth quarter of 2015. Interest expense increased by $11 million in the first quarter, primarily due to fees for the Verizon transaction bridge loan facilities.

\*     \*     \*

**Net income/loss** was a net loss of $186 million, or $0.16 per share, in the first quarter of 2016, compared to a net loss of $103 million, or $0.09 per share, in the fourth quarter of 2015. The first quarter of 2016 included acquisition related interest expense of $188 million and acquisition and integration costs of $138 million (combined after-tax impact of $200 million, or $0.17 per share). Excluding the impact of these items, the non-GAAP adjusted net income for the first quarter of 2016 was $14 million, or $0.01 per share, as compared to $56 million, or $0.05 per share, in the fourth quarter of 2015.

**Capital expenditures** for ongoing operations were $207 million for the first quarter of 2016 compared to $185 million for the fourth quarter of 2015. In addition, acquisition related capital expenditures were $52 million in the first quarter of 2016, similar to the fourth quarter of 2015.

\*     \*     \*

**2016 Full Year Guidance**

For the full year of 2016 including the impact of the California, Texas, and Florida acquisition, Frontier's expectation for adjusted free cash flow (as calculated per Schedule A) is in the range of $800 million to $925 million and for capital expenditures for Frontier's combined operations is in the range of $1,250 million to $1,400 million. Frontier expects 2016 cash taxes to be in the range of $5 million to $15 million.

68.     On May 5, 2016, defendants caused Frontier to file with the SEC a Form 10-Q for the first quarter of 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q reaffirmed the financial results announced in the May 3, 2016 press release, and contained signed SOX certifications by defendants McCarthy and Jureller.

69.     On August 1, 2016, Frontier announced its financial and operating results for the second quarter of 2016.  For the quarter, the Company reported a net loss of $80 million, or $0.07 per diluted share, on revenue of $2,608 million, compared to net loss of $28 million, or $0.03 per diluted share, on revenue of $1,368 million for the same period in the prior year.  The Company also announced it was narrowing its 2016 guidance ranges.

70.     The August 1, 2016 press release stated, in relevant part, as follows:

**Frontier Communications Reports 2016 Second Quarter Results**

- Achieved Annualized Cost Synergies of $1 billion in the Second Quarter

- Raising Cost Synergy Target to $1.25 billion from $700 million annually

- Broadband Upgrade Continues – Planning additional 1.5 million 50 Mbps capable or higher households over the next year

- 2016 guidance ranges narrowed; 2017 outlook guidance provided

- Dividend Payout Ratio of 49% in second quarter

. . . Frontier Communications Corporation today reported its financial results for the second quarter of 2016, *which include contributions from the fully integrated assets Frontier acquired from Verizon in California, Texas, and Florida (CTF)*.

*"We are very pleased with the performance of our newly acquired assets and our achievement of annualized cost synergies of $1 billion in the second quarter.  We now expect annual cost synergies related to the acquisition of $1.25 billion, up from our original estimate of $700 million," said Dan McCarthy, Frontier President and Chief Executive Officer*.

*As we move forward, we are continuing to focus on executing our strategy for growth, including upgrading our broadband speed capabilities, expanding our new Vantage video service to an increasing portion of our footprint, and implementing our successful commercial distribution capabilities in Frontier's new markets.  We will remain focused on increasing our broadband and video penetration, and improving our efficiency.  Our priorities continue to be driving strong free cash flow and continuing our disciplined capital allocation policy, which together underpin our very attractive, sustainable dividend, and industry leading dividend payout ratio.  We also are very well-positioned to achieve our plan to reduce leverage over time," McCarthy said*.

<u>Financial Highlights for the Second Quarter 2016</u>:

- Revenue of $2,608 million

- Operating income of $311 million, operating income margin of 11.9%

- Net loss of $80 million, or ($0.07) per share

- Adjusted EBITDA of $1,032 million, adjusted EBITDA margin of 39.6%

- Net cash provided from operating activities of $693 million

- Adjusted Free Cash Flow of $250 million

*      *      *

<u>Integration Costs</u>:

Frontier completed its CTF customer conversion activities in the second quarter and is finalizing the remainder of its integration work. During the second quarter, Frontier incurred $106 million of integration operating expenses and $36 million of integration capital expenditures. These costs were driven by cutover activities and the acceleration of certain projects to improve synergy attainment.

*      *      *

<u>Guidance</u>:

For the full year 2016, Frontier expects:

- Adjusted free cash flow (as calculated per Schedule A) to be in the range of $825 million to $900 million

- Capital expenditures to be in the range of $1,275 million to $1,325 million

- Cash taxes refunds to be in the range of $10 million to $20 million

- Cash contributions to the pension plan to be in the range of $10 million to $15 million.

- For the full year 2017, Frontier expects adjusted EBITDA to be greater than $4 billion.

(Footnotes omitted.)

71.    On the same day, the Company held an earnings conference call for the second quarter of 2016, in which defendant McCarthy reiterated the purported financial strength the Company was experience, stating:

> [W]e achieved annualized integration cost synergies of $1 billion in the second quarter.  This is a substantial outperformance relative to our original day one-target of $525 million.  We have also raised our total synergy target to $1.25 billion, which is considerably above our prior $700 million target.

> We are particularly pleased that EBITDA from the acquisition met our expectations.  Revenue for these assets was lower than anticipated as a result of a number of factors that John will discuss.  But because of increased synergies, EBITDA remained in line with expectations.

> \*    \*    \*

> The net result of these actions is illustrated by the relative stability of the revenue we achieved after Frontier became the owner of the new properties.

72.    During the same call, defendant Jureller misrepresented the strength of the Verizon Acquisition, stating that "[s]econd-quarter revenue was $2.61 billion, up from $1.36 billion in the first quarter, with the acquisition of the new markets driving this substantial increase."

73.    On August 8, 2016, defendants caused Frontier to file with the SEC a Form 10-Q for the second quarter of 2016 (the "Q2 2016 10-Q").  The Q2 2016 10-Q reaffirmed the financial results announced in the August 1, 2016 press release, and contained signed SOX certifications by defendants McCarthy and Jureller.

74.    On November 1, 2016, defendants caused Frontier to announce its financial and operating results for the third quarter of 2016.  For the quarter, the Company reported a net loss of $134 million, or $0.12 per diluted share, on revenue of $2,524 million, compared to net loss of $14 million, or $0.01 per diluted share, on revenue of $1,424 million for the same period in the prior year.  The November 1, 2016 press release stated, in relevant part:

**Frontier Communications Reports 2016 Third Quarter Results**

- Adjusted EBITDA of $1 billion and Net Loss of $80 million in the third quarter

- Announcing new organizational structure to enhance focus on Commercial and Consumer business units

- Annualized Cost Synergy target of $1.4 billion, with $1.25 billion to be realized by mid-2017

- *2016 guidance ranges refined*; outlook for 2017 Adjusted EBITDA reaffirmed

. . . Frontier Communications Corporation today reported its third quarter financial results and provided an update on its progress with the acquisition of Verizon's wireline properties in California, Texas, and Florida (CTF).

Dan McCarthy, President and CEO, stated, "I am pleased that we achieved third quarter adjusted EBITDA of $1 billion. We are reaffirming our adjusted EBITDA guidance for the 4th quarter and outlook for 2017. We are on course to improve our revenue performance, principally by returning to normal customer trends in the CTF market over the coming quarters."

Frontier today announced a new customer-focused organizational structure and the creation of Commercial and Consumer business units. The updated structure will result in enhanced focus on the commercial segment and more efficient capital allocation. Current regional support functions including Engineering, Finance, Human Resources, Communications and Marketing are being centralized to achieve improved operational performance as well as expense reductions.

Frontier's annualized cost synergy target is now $1.4 billion, up from the $1.25 billion target outlined in the second quarter earnings report. Yet-to-be attained cost synergies of $400 million are anticipated to be achieved by mid-year 2019, including $250 million anticipated to be achieved by mid-year 2017.

Frontier's priorities continue to be driving strong free cash flow and continuing a disciplined capital allocation policy. Frontier is committed to maintaining an attractive dividend, preserving its industry-leading dividend payout ratio, and reducing leverage.

Financial Highlights for the Third Quarter 2016:

- Revenue of $2,524 million

- Operating income of $264 million, operating income margin of 10.5%

- Net loss attributable to common shareholders of $134 million, or ($0.12) per share, and net loss of $80 million

- Adjusted EBITDA of $1 billion, adjusted EBITDA margin of 39.6%

- Net cash provided from operating activities of $321 million

- Adjusted Free Cash Flow of $168 million

Revenue:

| | For the quarter ended | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2016 | | | June 30, 2016 | | |
| *($ in millions)* | Consolidated Amount | CTF Operations | Frontier Legacy | Consolidated Amount | CTF Operations | Frontier Legacy |
| Total revenue | $    2,524 | $    1,212 | $    1,312 | $    2,608 | $    1,282 | $    1,326 |

Revenues from CTF Operations were impacted by a slower than expected recovery of FiOS® gross additions and an increased accounts receivable reserve associated with the resumption of normal customer collection activities. In addition, second quarter results included the one-time benefit of a true-up of CAF II revenues for the acquired states that did not recur in the third quarter.

\*        \*        \*

Integration Costs:

During the third quarter, Frontier incurred $122 million of integration operating expenses and $11 million of integration capital expenditures.

Guidance:

For the full year 2016, Frontier expects:

- Adjusted Free Cash Flow – between $920 million and $950 million

- Capital Expenditures – between $1,250 million and $1,275 million

- Cash Taxes – refund between $100 million and $110 million

- For the fourth quarter of 2016, Frontier expects:

- Adjusted EBITDA – at least $1 billion

(Footnotes omitted.)

75.     On November 3, 2016, defendants caused Frontier to file with the SEC a Form 10-Q for the third quarter of 2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q reaffirmed the financial results announced in the November 1, 2016 press release, and contained signed SOX certifications by defendants McCarthy and Jureller.

76.     The above statements and omissions set forth in ¶¶59-75 were false and misleading and/or failed to disclose that: (i) the Company acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon; (ii) as a result, the Company would be required to increase its reserves and write off amounts from accounts receivable associated with the non-paying accounts; (iii) defendants were aware that the Company was acquiring a substantial number of non-paying accounts;   (iv) as a result of the increase in reserves and write-offs the Company could not provide the growth and revenue as proclaimed in Frontier's public filings; and (v) the non-paying accounts would negatively impact Frontier's revenue and growth.

**The Truth Emerges**

77.     Defendants' scheme continued unabated until February 2017. Then, on February 27, 2017, Frontier was forced to admit that as a result of the Verizon acquisition the Company had acquired non-paying accounts which had a $45 million impact on fourth quarter revenue. The February 27, 2017 press release stated, in relevant part:

**Frontier Communications Reports 2016 Fourth Quarter and Full Year
Results**

- Adjusted EBITDA of $966 million and net loss of $80 million in the fourth quarter

- Full-year adjusted free cash flow of $921 million, with full year net cash provided by operating activities of $1,666 million

- ***Fourth quarter results impacted by resolution of non-paying acquired CTF accounts***

- Improved trend in broadband in both Legacy and CTF markets, excluding impact of non-paying account resolution

- Increased annualized cost synergy target to $1.6 billion, with $1.25 billion to be realized by end of Q1 2017, and $1.6 billion by end of Q2 2018

- Amended April 2021 term loan and revolver to provide more flexible terms, and upsized and extended revolver

- Board of Directors approved and will recommend to stockholders a reverse stock split

- Dividend payout ratio of 52% in 2016

- Provides 2017 guidance for adjusted free cash flow, capital expenditures, and cash taxes

. . . Frontier Communications Corporation today reported its fourth quarter and full year 2016 results and provided an update on its progress with its wireline properties acquired from Verizon in California, Texas, and Florida.

Dan McCarthy, President and CEO, stated, "During the quarter we made significant progress in positioning our company to deliver a better customer experience and improved financial performance, with greater financial flexibility. Our reorganization into separate Commercial and Consumer business units will result in a more customer-centric approach, while reducing expenses and enabling more efficient capital deployment. We now expect annualized cost synergies of $1.6 billion to be achieved by mid-year 2018, up from the $1.4 billion target outlined in the 2016 third quarter earnings report, and a full year earlier than anticipated. We expect $1.25 billion of the $1.6 billion in synergies will be achieved by the end of the first quarter of 2017, which is a quarter earlier than previously announced."

Mr. McCarthy continued: "Results for the fourth quarter were impacted by our intensified efforts to resolve acquired accounts in California, Texas and Florida that we have determined to be non-paying. This process is almost complete, and we expect to return to a normalized trend by the start of the second quarter. I am pleased that underlying CTF customer trends improved in Q4 and continue to improve in Q1."

McCarthy continued, "We are taking action to adapt our organization to the opportunities created by the increased scale and scope we recently acquired, to invest wisely in the business, and to improve our financial flexibility. We remain

- 37 -

committed to delivering shareholder value going forward, by improving revenue trends and managing expenses to provide healthy free cash flow and maintain our quarterly common dividend through a sustainable payout ratio."

<u>Financial Highlights for the Fourth Quarter 2016</u>

- Revenue of $2,409 million

- Operating income of $255 million; operating margin of 10.6%

- Net loss attributable to common shareholders of $133 million, or ($0.12) per share, and net loss of $80 million

- Adjusted EBITDA of $966 million; Adjusted EBITDA margin of 40.0%

- Net cash provided from operating activities of $714 million

- Adjusted free cash flow of $316 million

<u>Revenues</u>

| | For the quarter ended | | | | | |
| | December 31, 2016 | | | September 30, 2016 | | |
| *($ in millions)* | Consolidated Amount | CTF Operations | Frontier Legacy | Consolidated Amount | CTF Operations | Frontier Legacy |
|---|---|---|---|---|---|---|
| Total revenue | $ 2,409 | $ 1,128 | $ 1,281 | $ 2,524 | $ 1,212 | $ 1,312 |

Revenues for the fourth quarter were $2,409 million, compared to $2,524 million in the third quarter.  Approximately $45 million of the sequential decline in revenue was related to resolution of CTF accounts that were determined to be non-paying following an intensified effort to address overdue accounts.  Frontier began the normal process of addressing overdue accounts in the CTF markets in July 2016, following completion of the cutover.  The resolution of those overdue accounts accelerated to an above-normal pace during the fourth quarter.

Frontier anticipates that the impact of this resolution process will decline to approximately $25 million in the first quarter of 2017.  This initiative is nearly complete and Frontier expects to be processing overdue accounts in a normal manner before the end of the first quarter.

Fourth-quarter revenue trends in Legacy reflect some disruption from the integration activity underway in the third quarter.  Legacy sales trends began to improve in the last month of the fourth quarter.

\*        \*        \*

<u>Guidance</u>

For the full year 2017, Frontier expects:

- Adjusted free cash flow – $800 million to $1.0 billion

- Capital expenditures – $1.0 billion to $1.25 billion

- Integration – operating expense less than $50 million; capital expenditures less than $50 million

- Cash taxes – $0 to $50 million

(Footnotes omitted.)

78.     On the same day, the Company held its earnings conference call for the fourth quarter of 2016, during which defendant McCarthy stated, in relevant part, as follows:

We have provided a time line of the account cleanup issue. As you can see, in anticipation of the deal close, Verizon stop[ed [sic] treatment of overdue accounts on February 1, 2016. We continued non-treatment of these accounts through July 20, as we worked through the cut over.

We have been working through the account cleanup process since July 20. We began disconnecting non-paying accounts at the end of August and continued this through Q1.

From an accounting standpoint, we began to reserve aging accounts in accordance with our normal policies in Q2, and then increased our reserves, as we discussed on the last earnings call. We began permanent disconnects and receivable write-offs in 3Q, continued them in 4Q, and expect to complete them this month.

Turning to slide 6, CTF account cleanup had a $45 million impact on fourth-quarter revenue, and we estimate less than a $25 million impact in first-quarter revenue. We do not expect any further account cleanup impact beyond the first quarter, and we are now operating normally with respect to the acquired customer receivable.

We completed this cleanup process this month. This was due to the backlog and the specific rules and customer treatment processes dictated by relevant franchising authorities. We are taking steps to more aggressively manage costs in light of the longer timeframe needed to clean up this account group.

79.     On this news, the price of Frontier stock collapsed, falling by 11% from $49.35 per share to $43.95 per share, wiping out $424 million in market capitalization.

80.     Then, on May 2, 2017, Frontier was forced yet again to admit that as a result of the Verizon Acquisition:

[The Company's] first quarter revenue was impacted by the final cleanup of the CTF nonpaying accounts and the automation of the legacy nonpay disconnect process. The CTF account cleanup reduced Q1 revenue by $11 million, and the onetime impact related to automating the nonpay disconnect process for the legacy properties reduced Q1 revenue by $5 million.

The May 2, 2017 press release stated, in relevant part:

### Frontier Communications Reports 2017 First Quarter Results

- Adjusted EBITDA of $923 million and ***quarterly Net Loss of $75 million***

- Third sequential quarter of improved FiOS® gross adds in CTF markets

- ***Resolution of non-paying CTF accounts completed, in line with previous disclosures***

- Achieved target of $1.25 billion in total annualized synergies by end of Q1 2017, and remain on track to deliver an additional $350 million by end of Q2 2018

- Board revises capital allocation strategy, including reducing the quarterly dividend to $0.04 per share and accelerating the pace of debt and leverage reduction

. . . Frontier Communications Corporation today reported its first quarter 2017 results, and announced that the Board of Directors has revised the Company's capital allocation strategy, which includes a reduction in the quarterly dividend to $0.04 per share, to enhance financial flexibility and achieve a targeted leverage ratio of 3.5x by year-end 2021, down from the current ratio of 4.39x.

Dan McCarthy, President and CEO, stated, "During the quarter, we continued to realize our targeted efficiencies and synergies, and I am also pleased to have achieved our third consecutive quarter of improved FiOS gross additions in the California, Texas and Florida (CTF) markets. We are executing on a number of initiatives with the goal of enhancing customer experience, reducing churn, stabilizing revenues and generating cash flow.

"Our Board regularly reviews the Company's long-term capital allocation strategy, and it has determined to reduce the dividend at this time to provide additional financial flexibility, while still returning a meaningful cash dividend to shareholders. As we continue to execute on our strategy to deliver on the full potential of our strong assets and generate additional cash flow, we will optimize our capital allocation to ensure we strike a balance between investing in the business, paying down debt and returning capital to shareholders," said McCarthy.

**Business Highlights**

- Frontier achieved a third consecutive quarter of growth in broadband gross additions in its CTF markets, which was driven by the first full quarter of robust marketing

- Overall, consumer churn was elevated during the quarter, and to address this Frontier is investing in a number of initiatives that will improve customer care, retention and acquisition, including:

  - Implementation of Pega® platform underway that will integrate back-office systems to allow Frontier to transform customer experience management, marketing and cost-to-serve

  - Launched e-commerce platform in April to create additional sales channel, improve customer experience and reduce call center volume

- Increased CAF II households by over 27,000, plus another 82,000 households in adjacent areas

- Completed redeployment of commercial salesforce to align with network and market opportunity

*        *        *

**Financial Highlights for the First Quarter 2017**

- Revenue of $2,356 million

- Operating income of $271 million; operating margin of 11.5%

- Net loss of $75 million; net loss attributable to common shares of $129 million, or ($0.11) per share

- Adjusted EBITDA of $923 million; Adjusted EBITDA margin of 39.2%

- Net cash provided from operating activities of $300 million

- Adjusted free cash flow of $175 million

<u>Revenues</u>

| | For the quarter ended | | | | | |
| | March 31, 2017 | | | December 31, 2016 | | |
| ($ in millions) | Consolidated Amount | CTF Operations | Frontier Legacy | Consolidated Amount | CTF Operations | Frontier Legacy |
|---|---|---|---|---|---|---|
| Total revenue | $ 2,356 | $ 1,087 | $ 1,269 | $ 2,409 | $ 1,128 | $ 1,281 |

Revenues for the first quarter were $2,356 million, compared to $2,409 million in the fourth quarter of 2016. Approximately $11 million of the sequential decline in revenue was a result of the previously disclosed cleanups of CTF accounts that were determined to be non-paying following an intensified effort to address overdue accounts. The cleanup associated with those overdue accounts has now been completed. As previously disclosed, first-quarter revenue and customer trends in Legacy operations reflect a one-time impact from the automation of processes to address non-paying customers, which accelerated deactivations. This process is now complete, and we estimate the impact resulted in a one-time reduction in customers of 18,000 which impacted Legacy revenues by $5 million.

*     *     *

Guidance

For the full year 2017, Frontier reiterated its guidance of:

- Adjusted free cash flow - $800 million to $1.0 billion

- Capital expenditures - $1.0 billion to $1.25 billion

- Integration – operating expense less than $50 million; capital expenditures less than $50 million

- Cash taxes – $0 to $50 million

(Footnotes omitted.)

81.     On the same day, the Company held its earnings conference call for the first quarter of 2017, during which defendant McBride stated, in relevant part, as follows:

First quarter revenue of $2.36 billion declined $53 million from the $2.41 billion reported in the fourth quarter of 2016. Approximately $16 million of the sequential decline in revenue was a result of the previously disclosed cleanup of CTF non-paying accounts and the automation of legacy non-pay disconnects. The cleanup and automation processes have now been completed. . . .

. . . Customer revenue of $2.16 billion was down $51 million or 2.3% sequentially from the fourth quarter of 2016. As previously disclosed, first quarter revenue was impacted by the final cleanup of the CTF non-paying accounts and the automation of the legacy non-pay disconnect process. The CTF account cleanup reduced Q1 revenue by $11 million, and the one-time impact related to automating the non-pay disconnect process for the legacy properties reduced Q1 revenue by $5 million. As stated earlier, these are now complete.

82.     Following this news, on May 2, 2017 Frontier's stock price declined again, falling $4.80 per share (more than 16%), on unusually heavy trading volume, from $28.95 to $24.15 per

share, wiping out $376.9 million more in market capitalization.  Worse, Frontier has been named as a primary defendant in costly and expensive-to-defend class action lawsuit brought by Frontier's shareholders for alleged violations of the federal securities laws.

## DAMAGES

83.    As a direct and proximate result of defendants' faithless misconduct, Frontier has been severely damaged and injured.  For at least the foreseeable future, Frontier will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Frontier's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Further, as a direct and proximate result of defendants' misconduct, Frontier has been named a defendant in class action lawsuits for violations of the federal securities laws.  *See, e.g.*, *Bray v. Frontier Communications Corporation, et al.*, No. 3:17-cv-01617-VAB (D. Conn.), filed September 26, 2017, *Rozenberg v. Frontier Communications Corporation, et al.*, No. 3:17-cv-01672-VAB (D. Conn.), filed October 4, 2017, and *Morrow v. Frontier Communications Corporation, et al.*, No. 3:17-cv-01759-VAB (D. Conn.), filed October 19, 2017.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84.    Plaintiff incorporates ¶¶1-83.

85.    Plaintiff brings this action derivatively on behalf of Frontier to redress injuries suffered, and to be suffered, by Frontier as a direct result of defendants' breaches of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment.  Frontier is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86.    Plaintiff will adequately and fairly represent the interests of Frontier in enforcing and prosecuting its rights.

87.     As of the date this complaint was filed, the Frontier Board had nine members: defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott and Shapiro. (Defendant Wick did not stand for re-election in May 2018.)  Plaintiff has not made a demand on Frontier's Board to institute this action because such a demand would have been a useless and futile act, and is therefore excused, particularly for reasons set forth below.

88.     Any suit by the directors of Frontier to remedy the wrongs complained of herein would expose defendants themselves and their friends and business allies to significant personal liability for their breaches of fiduciary duties and other misconduct.  Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro and Wick have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the wrongful conduct described herein.  Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro and Wick are accused of wrongdoing and recommending, approving, and ratifying the materially false and misleading statements identified herein and, thus, face a substantial likelihood of liability, thereby rendering any demand upon them futile.

89.     The Compensation Committee of the Board, consisting of defendants Bynoe, Ferguson, Ruesterholz and Wick, is responsible for approving Frontier's executive officers' compensation, including that of defendants Jureller, McCarthy, McBride and Wilderotter.  Between 2015 and 2017, defendants Jureller, McCarthy, McBride and Wilderotter collectively received $17,600,049 million in total compensation based on their employment as executives of Frontier.  As the members of the Compensation Committee singularly control approval of defendants Jureller, McCarthy, McBride and Wilderotter's compensation, defendants Jureller, McCarthy, McBride and Wilderotter will not institute this action against defendants Bynoe, Ferguson, Ruesterholz and Wick.

To do so would jeopardize their personal financial compensation.  Thus, demand on defendants

Jureller, McCarthy, McBride and Wilderotter is futile.

90.    According to the Company's Compensation Committee Charter, the responsibilities

of Frontier's Compensation Committee entail the following:

> [A]pproving and evaluating the non-employee director and officer compensation plans, policies, and programs of the Company, including (i) determining and approving the compensation of the Company's Chief Executive Officer ("CEO"); (ii) reviewing and approving compensation levels for the Company's other executive officers; (iii) reviewing the compensation of the Company's non-employee directors and making recommendations to the Board in respect thereof; (iv) reviewing and approving management incentive compensation policies and programs; (iv) reviewing and approving equity compensation programs for employees, and exercising discretion in the administration of such programs; and (v) producing an annual report on executive compensation for inclusion in the Company's proxy statement in accordance with applicable rules and regulations of the Securities and Exchange Commission ("SEC").

Thus, because each director defendant approves each other director defendant's cash compensation,

each director defendant would not institute this action against the other director defendants, as it

would jeopardize their personal compensation.  Thus, demand on each of defendants Bynoe,

Ferguson, Ruesterholz and Wick is futile.

91.    Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz,

Schrott, Shapiro and Wick were aware of, participated in, and approved of the wrongs alleged

herein.  Thus, defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott,

Shapiro and Wick have knowingly chosen not to exercise the fiduciary duties of loyalty and due care

owed to the Company and protect Frontier, or to rectify the illegal practices complained of herein.

Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro and

Wick therefore have approved of and continue to participate in a course of corporate misconduct that

includes the following:

(a)    Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz,

Schrott, Shapiro and Wick were involved in approving and/or condoning the materially false and

misleading statements.   Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro and Wick each had the ability and/or opportunity to prevent these practices and did not take action to correct the materially false and misleading statements disseminated to shareholders regarding the financial impact the non-paying accounts acquired as a result of the Verizon Acquisition would have on the Company's financials.  The Board is responsible for overseeing the Company's compliance with legal requirements and, therefore, all director defendants are liable for not ensuring that the officers and employees of the Company did not expose the Company to unnecessary risk.  Because defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro and Wick are liable for approving and directing the illegal conduct described herein, demand upon them would be futile.

(b)    Defendants Barnes, Ferguson, Fraioli and Schrott serve on the Audit Committee of the Frontier Board.  Members of the Audit Committee, because of their position of control and authority over Frontier, were able to, and did, directly and indirectly, control the wrongful acts complained of herein.  The members of the Audit Committee failed to ensure that the Company had and maintained adequate internal financial controls and failed to ensure the integrity of the Company's public statements regarding the effects the loss of critical data feeds would have on the Company.  Because members of the Audit Committee had an affirmative duty to ensure that the Company's public statements regarding the Company's financial results and prospects were accurate and truthful, and failed to do so, members of the Audit Committee breached their fiduciary obligations due the Company.  Accordingly, defendants Barnes, Ferguson, Fraioli and Schrott cannot impartially respond to a demand, rendering demand upon them futile.

(c)    Defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro and Wick refused to put into place adequate internal controls and adequate means of supervision to stop the wrongful conduct alleged herein despite the fact that the Board knew and/or

recklessly ignored such wrongful business practices.  These acts, and the acts alleged in this action, demonstrate a pattern of gross misconduct, which conduct is not taken honestly and in good faith.

92.    Defendants' illegal conduct is not subject to business judgment protection or subject to ratification.

93.    The wrongful conduct complained of herein by defendants Barnes, Bynoe, Ferguson, Fraioli, McCarthy, Reeve, Ruesterholz, Schrott, Shapiro and Wick amounted to breaches of their fiduciary duties of good faith, due care, and loyalty to Frontier and its shareholders.

94.    Moreover, despite defendants having knowledge of the claims and causes of action raised by plaintiff, the Board has failed and refused to seek to recover for Frontier for any of the wrongdoing alleged by plaintiff herein.

95.    Plaintiff has not made any demand on Frontier's shareholders to institute this action since such a demand would be a futile and useless act for the following reasons:

(a)    Frontier is a publicly traded company with over 80.13 million shares outstanding and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### For Breach of Fiduciary Duty
### Against All Defendants

96.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

97.    By their wrongful acts and omissions, defendants breached their fiduciary duties owed to Frontier and its shareholders.

98.    Here, defendants violated those fiduciary duties by, among other things, making false statements and/or failing to disclose adverse material non-public information regarding Frontier's business, finances, and prospects for future growth in revenues, net income, and earnings in the Company's SEC filings and press releases.

99.    As a result of defendants' fiduciary failure, Frontier has been damaged.

100.    Plaintiff, on behalf of Frontier, has no adequate remedy at law.

## COUNT II

### For Abuse of Control
### Against All Defendants

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence Frontier, for which they are legally responsible.

103.    As a direct and proximate result of defendants' abuse of control, Frontier has sustained significant damages.

104.    As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III

### For Gross Mismanagement
### Against All Defendants

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    By their actions alleged herein, defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Frontier in a manner consistent with the operations of a publicly held corporation.

107.    As a direct and proximate result of defendants' gross mismanagement and breaches of duty alleged herein, Frontier has sustained significant damages.

108.    As a result of the misconduct and breach of fiduciary duties alleged herein, defendants are liable to the Company.

## COUNT IV

### For Unjust Enrichment
### Against All Defendants

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Frontier.

111.    All the payments and benefits provided to defendants were at the expense of Frontier. The Company received no benefit from these payments.

112.    Plaintiff, on behalf of Frontier, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

113.    Plaintiff, on behalf of Frontier, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against defendants and in favor of Frontier for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment;

B.    Directing Frontier to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Frontier and its shareholders from a repetition of the damaging events described herein;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and the state statutory provisions sued hereunder, including attaching, impounding, and imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Frontier has an effective remedy;

D.     Awarding to Frontier restitution from defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by defendants;

E.     Awarding plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 16, 2018                    DISERIO MARTIN O'CONNOR
                                          & CASTIGLIONI LLP
                                         JONATHAN P. WHITCOMB (ct15014)

                                                    /s/ Jonathan P. Whitcomb
                                         ———————————————————
                                               JONATHAN P. WHITCOMB
                                         One Atlantic Street, 8th Floor
                                         Stamford, CT  06901
                                         Tel:  203-358-0800
                                         Fax: 203-348-2321
                                         jwhitcomb@dmoc.com

                                         *Local Counsel for Plaintiff*

                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         BENNY C. GOODMAN III
                                         ERIK W. LUEDEKE
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101-8498
                                         Tel:  619-231-1058
                                         Fax: 619-231-7423 (fax)
                                         bennyg@rgrdlaw.com
                                         eluedeke@rgrdlaw.com

                                         *Counsel for Plaintiff*

## VERIFICATION

I, Sharon Williams, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Gross Mismanagement, Corporate Waste and Unjust Enrichment ("Complaint") and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 11th day of May, 2018.

SHARON WILLIAMS